UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WH HOLDINGS, LLC, ET AL.                    CIVIL ACTION

VERSUS                                      NO: 07-7110

ACE AMERICAN INSURANCE CO.                  SECTION: "A" (5)

## ORDER AND REASONS

Before the Court are cross **Motions for Summary Judgment (Rec. Docs. 190 & 200)** filed by plaintiffs WH Holdings, LLC, AXIS US Insurance Co., XL (Bermuda) Ltd., Lloyds of London, and Swiss Re International SE (collectively "WH Holdings or Plaintiffs") and defendant ACE American Insurance Co. ("ACE or Defendant"). The motions, scheduled for submission on February 13, 2013, are before the Court on the briefs without oral argument.[1] For the reasons that follow, the motion filed by ACE is GRANTED and the motion filed by Plaintiffs is DENIED.

## I.   BACKGROUND

A complete factual background for this case can be found in the Court's original ruling on the cross motions for summary judgment on coverage, (Rec. Doc. 149), and in the Fifth Circuit's unpublished decision vacating that ruling, *WH Holdings, LLC v. ACE American Ins. Co.*, 481 Fed. Appx. 894 (5th Cir. 2012).

This suit was originally filed in state court by WH Holdings, LLC against ACE American Insurance Co. to recover for damage sustained at the Ritz-Carlton New

---

[1] Oral argument has been requested but the Court is persuaded that the parties' briefing is more than adequate in light of the issues presented.

Orleans as a result of Hurricane Katrina. ACE had issued a builder's risk policy to Gootee Construction Co., which had been doing renovation work at the Ritz when Katrina hit. This lawsuit involves damage to the Ritz's EIFS (exterior insulating finishing system) window system and terra cotta façade. ACE removed the suit to this Court on October 19, 2007.

After the case was removed, WH Holdings, which had been the sole plaintiff in the case, amended its complaint to bring the Excess Insurers[2] in as plaintiffs. (Rec. Doc. 98). The Excess Insurers obtained all of WH Holdings' rights in this lawsuit via a Sale of Litigation Agreement ("the Agreement"). (Rec. Doc. 98; Amended Comp. ¶ 19 & Exh. A). Via the Agreement, it is the Excess Insurers who have standing to assert whatever rights WH Holdings might have had as an insured against ACE for damage to the Ritz-Carlton. (Rec. Doc. 225). WH Holdings no longer has an interest in this lawsuit but given that the Excess Insurers' rights derive solely from WH Holdings, the Court will at times in this ruling refer to WH Holdings as if it were an interested party to this lawsuit.

ACE has always maintained that WH Holdings was not an insured under Gootee's builder's risk policy. In the summer of 2010, the parties filed cross motions on the insured status issue, and on September 24, 2010, the Court granted ACE's motion for summary judgment, concluding that WH Holdings was not an insured. (Rec. Doc.

_____

[2] The Excess Insurers are plaintiffs AXIS US Insurance Co., XL (Bermuda) Ltd., Lloyds of London, and Swiss Re International SE.

149). Plaintiffs appealed, and the Fifth Circuit vacated the ruling and judgment in

ACE's favor and remanded the case with instructions to consider extrinsic evidence.

*WH Holdings*, 481 Fed. Appx. at 899. The appellate court explained that the insured

status issue could not be unambiguously resolved by examining only the relevant

contractual text. *Id.*

The motions currently before the Court are the parties' re-urged cross motions

for summary judgment on the insured status issue, as contemplated by the Fifth

Circuit's decision on appeal. Per the Fifth Circuit's instructions the Court will

reexamine the insured status issue by considering extrinsic course of conduct evidence

and other forms of extrinsic evidence contemplated by Louisiana law. Discovery is now

complete and the case is scheduled for trial on September 4, 2013. (Rec. Doc. 233).

## II.    DISCUSSION

The Court once again must determine whether WH Holdings was an insured

under the ACE policy, and if it was, whether ACE's policy provided primary coverage.[3]

ACE issued the policy to Gootee Construction. Nothing in the record suggests that

Gootee procured the builder's risk policy specifically for the work that Gootee was

performing at the Ritz.[4] It is undisputed, however, that the Ritz location was a covered

---

[3] If the Court concludes that WH Holdings is an insured under the ACE's builder's risk policy, then ACE contends that Plaintiffs' policy provided primary coverage. It is undisputed that the Ritz was insured under the global policy that Plaintiffs had issued to Marriott International. (Rec. Doc. 200-7, ACE Exhibit C, Marriott International Policy). WH Holdings was an additional insured on the Marriot International policy.

[4] The Covered Property is described as "New Construction, Additions & Non-Structural Renovations to Commercial Buildings." (Rec. Doc. 200-10, ACE Exhibit D, ACE

construction site on Gootee's policy with ACE because Gootee included the Ritz site on

its monthly locations report to ACE. (Rec. Docs. 190-28 to 190-39, Plaintiffs' Exhibits

19-30, Reporting Form). WH Holdings was not a named insured on the policy and

nothing in the record suggests that WH Holdings was ever in privity with ACE or

played any role in procuring the policy. But the policy that ACE issued to Gootee

contained a Broad Named Insured endorsement such that "any party in interest ***which

the insured is responsible to insure***" can become an insured under the policy. (Rec.

Doc. 194-24 at 7 (emphasis added), Plaintiffs' Exhibit 16, ACE Policy). Thus, the

determinative question as to WH Holdings' insured status remains the same today as it

was in 2010: Was Gootee "responsible," *i.e.*, contractually obligated, to insure WH

Holdings' interest in the renovation work being performed at the Ritz? If it was then,

WH Holdings became an additional insured on the builder's risk policy that ACE issued

to Gootee.

 Approaching the question today, however, the Court and the parties have the

benefit of the appellate court's decision and the law of the case that it imposes. We now

---

Policy). Neither the Ritz location nor any other location is mentioned by name. Rather,
Gootee procured the builder's risk policy on a yearly basis and then obtained coverage for
specific work sites by including them on a monthly report to ACE. (Rec. Docs. 190-28 to 190-
39, Plaintiffs' Exhibits 32-35, Reporting Form). ACE would then adjust the premium due
based on the risk involved with the specific job sites included on the report. (Rec. Docs. 190-
41 to 190-44, Plaintiffs' Exhibits 32-35, Earned Premium Endorsement). The Reporting
Forms include job sites other than the Ritz location. (Rec. Docs. 190-28 to 190-39, Plaintiffs'
Exhibits 19-30, Reporting Forms).

know that the parties' construction contract,[5] to the extent that WH Holdings and Gootee had attempted to define their respective insurance obligations as to renovation work, is ambiguous as a matter of law. In fact, the contract neither unambiguously required WH Holdings to procure the necessary builder's risk insurance nor unambiguously required Gootee to procure it. *WH Holdings*, 481 Fed. Appx. at 898. Consequently, the Court can only resolve the contractual ambiguity as to builder's risk insurance by considering extrinsic course of conduct evidence and other forms of extrinsic evidence contemplated by Louisiana law. This evidence is to be considered solely for the purpose of resolving the problematic contractual ambiguity, not amending or modifying the contract. *Id.* at 899 n.3.

**Governing Law**

Interpretation of a contract is the determination of the common intent of the parties. La. Civ. Code art. 2045. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. Civ. Code art. 2050. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. Civ. Code art. 2046.

A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of the written contract are susceptible to

---

[5] The Court refers here to the parties to the construction contract, not the parties to this lawsuit. The parties to the construction contract were WH Holdings and Gootee. Gootee is not a party to this lawsuit. And ACE, which is a party to this lawsuit, was not a party to the construction contract.

more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed. *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002) (*citing* La. Civ. Code art. 1848). The WH Holdings/Gootee construction contract is ambiguous as to which party was obligated to procure builders risk insurance for the renovation work at issue. *WH Holdings*, 481 Fed. Appx. at 898.

A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. Civ. Code art. 2049. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. Civ. Code art. 2050.

Extrinsic evidence is admissible to clarify a contractual ambiguity or to show the parties' intent. *Total Minatome Corp. v. Union Tex. Prods. Corp.*, 766 So. 2d 685, 689 (La. App. 2d Cir. 2000) (*citing Doyal v. Pickett*, 628 So. 2d 184 (La. App. 2d Cir. 1993)). Intent is an issue of fact which is to be inferred from all the surrounding circumstances. *Total Minatome*, 766 So. 2d at 689 (*citing Futch v. Futch*, 643 So. 2d 364 (La. App. 2d Cir. 1994)). One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for many years. *Id.* (*citing Spohrer v. Spohrer*, 610 So. 2d 849 (La. App. 1 Cir. 1992)). A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the

6

contract, and of other contracts of like nature between the same parties.[6] La. Civ. Code art. 2053. Where no issue of fact exists as to the past conduct and course of dealing of the parties and their predecessors over many years, the factual issue of intent may be resolved on summary judgment. *Total Minatome*, 766 So. 2d at 690 (*citing Arco Oil & Gas Co. v. Union Tex. Prods. Corp.*, 610 So. 2d 248 (La. App. 3d Cir. 1992)).

In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. Civ. Code art. 2056. A contract executed in the standard form of one party must be interpreted, in case of doubt, in favor of the other party. *Id.* In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation. La. Civ. Code art. 2057. Yet if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether the obligee or obligor. *Id.*

**Analysis**

At the outset, and particularly in light of WH Holdings' submissions, the Court feels compelled to clarify two points before proceeding to the evidence. First, WH Holdings bears the burden of proof as to its status as an insured under the ACE policy.

---

[6] Equity is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. Usage is a practice regularly observed in affairs of a nature identical to or similar to the object of a contract subject to interpretation. La. Civ. Code art. 2055.

ACE does not bear the burden of negating WH Holdings' claim to insured status. In Louisiana, an insured must meet the initial burden of establishing that the policy affords coverage for an incident and that the incident falls within the policy's terms. *Russell v. Eye Assocs.*, 74 So. 3d 230, 234 (La. App. 2d Cir. 2011). This initial burden applies to those insureds whose status as such is not in question and therefore have undisputed rights to seek coverage under the policy. If a bona fide insured must prove coverage, then it follows rather easily that a party like WH Holdings with no privity to the insurer who seeks coverage as an insured on a policy bears the burden of proof on insured status. This conclusion is buttressed by Louisiana Civil Code article 1831 which states that "[a] party who demands performance of an obligation must prove the existence of the obligation."

Second, with so much evidence now in the record, and given that WH Holdings has now focused solely on the extrinsic evidence while ignoring the construction contract itself, it is important to remain mindful of the proper role that the evidence plays in WH Holdings' pursuit of recovery under the ACE policy. The fact that WH Holdings and Gootee managed to confect an ambiguous contract between themselves cannot prejudice ACE. Ambiguities notwithstanding, WH Holdings' *sole* means to force ACE to recognize it as an additional insured on the builder's risk policy is to establish that the WH Holdings/Gootee construction contract required Gootee to insure WH Holdings' interest in the renovation work taking place at the Ritz. The extrinsic evidence that the Court now considers will only benefit WH Holdings to the extent that

8

it actually serves to resolve the contractual ambiguity as to builder's risk insurance in WH Holdings' favor. If the extrinsic evidence does not resolve the ambiguity in WH Holdings' favor or if the contract remains hopelessly ambiguous even after considering the evidence, then WH Holdings will have failed in its burden of proof and ACE will not be required to recognize WH Holdings as an insured. *See* La. Civ. Code art. 2057 ("In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation."); *see Miller v. Miller*, 1 So. 3d 815, 819 (La. App. 2d Cir. 2009). The Fifth Circuit's decision in this case did not render the construction contract itself irrelevant.

Because ACE's obligations to WH Holdings, if any, turn solely on Gootee's obligations to WH Holdings under the construction contract, the Court begins once again with the WH Holdings/Gootee construction contract. Several individual construction contracts governed the renovation work at the Ritz but all of the contracts were subject to the General Conditions, which is the document that recited the pertinent, albeit ambiguous insurance obligations. (Rec. Doc. 190-11, Plaintiffs' Exhibit 8, General Conditions). As the Court explained last time,[7] subsection 11.4 of the General Conditions, entitled Property Insurance, contains two subsections, 11.4.1 and

---

[7] Here the Court incorporates by reference its comprehensive opinion discussing in detail the relevant portions of the General Conditions. (Rec. Doc. 149). The Court will not repeat everything discussed in that opinion here. But the only aspect of the opinion that the Fifth Circuit disturbed on appeal was the Court's conclusion that extrinsic evidence would be unnecessary because the policy was unambiguous as to which party was obligated to procure builder's risk insurance for the renovations at issue. Therefore, the Court's reasoning and discussions regarding the text of the construction contract are still applicable.

11.4.1.1, that unarguably make Gootee responsible for procuring builder's risk

coverage.[8] And section 11.4 does not distinguish between new construction versus

additions or renovations with respect to builder's risk property insurance. As the Court

previously observed, if subsection 11.4.1 existed in a vacuum then ACE would have no

basis to contest the assertion that Gootee was responsible to procure builder's risk

coverage to insure WH Holdings' interest in the renovations at the Ritz. (Rec. Doc. 149

at 8).

The ambiguity as to the obligation to procure builder's risk coverage arises,

however, not from section 11.4 in isolation but rather from the addition of subsection

11.1.5(g), which at first blush seems to shift the obligation to the Owner to procure

builder's risk coverage for renovation work.[9] The ambiguity with subsection 11.1.5(g)

---

[8] Section 11.4 of the Policy is entitled Property Insurance and the pertinent
subsections read in part:

> 11.4.1  "~~Unless otherwise provided, the Owner~~ The Contractor shall purchase and
> maintain in a company or companies lawfully authorized to do business in the
> jurisdiction in which the Project is located, property insurance written on a builder's
> risk or equivalent policy form in the amount of the mutual Contract Sum . . . ."
>
> 11.4.1.1  Property insurance shall be on an "all risk" or equivalent policy form and
> shall include, without limitation, insurance against the perils of fire (with extended
> coverage) and physical loss or damage . . . ."

Rec. Doc. 190-12 at 23, Plaintiffs' Exhibit 8, General Conditions.

[9] Section 11.1.5(g) states as follows:

> g.  Builder's Risk Insurance Limits
>                          Full Replacement Cost Value on the Work being
>                          installed as described in the Construction Contract
>
> This policy shall name as an [sic] named insured the Owner and any

10

arises not so much from its content but rather from the fact that the text was manually placed in a section of the General Conditions that purports to deal solely with third-party liability insurance, as opposed to first-party property damage. Adding to the ambiguity is the fact that the prefatory language for subsection 11.1.5 attempts to tie everything in that section, including subsection 11.1.5(g), to insurance coverages found in subsection 11.1.1, which again purports to deal only with third-party liability insurance.[10] But as this Court explained in great detail in its prior decision, subsection

---

other entity required by the Contract between the Contractor and the Owner.

This policy shall waive subrogation against Owner and any other Owner related entity whether or not required by the Contract between the Contractor and the Owner.

This coverage will be placed by the Contractor on an "All Risk" replacement cost basis for the full value of construction ***unless the construction is an addition or renovation to an existing structure. If this construction is an addition or renovation than [sic] the Owner shall be responsible for providing this coverage*** and will add the Contractor and its subcontractors and sub-subcontractors as additional insureds and waive subrogation against the Contractor and its subcontractors and sub-subcontractors as regards any structures being built or renovated and already existing at the site.

Rec. Doc. 190-12 at 22 (emphasis added), Plaintiffs' Exhibit 8, General Conditions § 11.1.5(g).

[10]   The prefatory language to subsection 11.1.5 reads as follows:

The insurance covered by paragraph 11.1.1 shall be written for not less than the following limits, or greater if required by law.

Rec. Doc. 190-12 at 20, Plaintiffs' Exhibit 8, General Conditions § 11.1.5.

11.1.5(g) cannot be reconciled with any of the third-party liability coverages listed in
subsection 11.1.1, which is what WH Holdings had been urging this Court to do. On the
other hand, as the Fifth Circuit explained on appeal, subsection 11.1.5(g) likewise
cannot be unambiguously reconciled with the property insurance obligation created in
subsection 11.4.1, again in light of subsection 11.1.5(g)'s physical placement in the
General Conditions and the prefatory language to section 11.1.5. Thus results the
ambiguity as to which party was responsible to procure builder's risk insurance for
renovation work at the Ritz.

    ACE's position is that the parties intended for subsection 11.1.5(g) to reverse the
subsection 11.4.1 obligation to procure builder's risk coverage when renovations were
involved. WH Holdings has never been able to persuasively explain what 11.1.5(g) could
mean if the contract is construed as assigning to Gootee the property insurance
obligation for all projects, renovation or otherwise, and the Fifth Circuit specifically
noted this weakness in WH Holdings' position. *WH Holdings*, 481 Fed. Appx. at 898. In
its current briefing WH Holdings abandons any attempt to reconcile subsection
11.1.5(g) with the remainder of the General Conditions and instead focuses solely on
extrinsic evidence. WH Holdings' approach is problematic because the extrinsic
evidence is only admissible for the purpose of clarifying the parties' intent with respect
to the obligations created by subsections 11.4.1 and 11.1.5(g). ACE's obligations flow
strictly from its policy, and by incorporation the General Conditions, ambiguities
notwithstanding. And Louisiana law requires that the Court interpret subsection

12

11.1.5(g) so as to render it effective, not ineffective. *See* La. Civ. Code art. 2049. This is particularly true with subsection 11.1.5(g) because it was drafted from scratch and inserted into the form General Conditions as manuscript text. Gootee and WH Holdings obviously intended for it to mean something.

With this in mind the Court now turns to the evidence on course of conduct to see if it resolves the ambiguity created by the interplay of subsections 11.4.1 and 11.1.5(g). If after consideration of all the evidence, as viewed through the prism of the General Conditions, the question of Gootee's builder's risk procurement responsibilities remains ambiguous or doubtful, then ACE will be entitled to summary judgment on the issue of coverage.[11]

WH Holdings focuses mostly on Gootee's pre-Katrina conduct in support of its contention that the General Conditions required Gootee to obtain builder's risk coverage for the Ritz. WH Holdings points out that Gootee included the cost of builder's risk insurance in its initial job estimate for the work at the Ritz. Then Gootee did in fact procure builder's risk coverage for the work performed at the Ritz, and it did this by reporting the Ritz location to ACE on monthly progress reports. ACE charged Gootee a premium for that coverage. Gootee then charged the cost of the premium back to WH Holdings who paid it without objection. WH Holdings contends that the construction

---

[11] No party has argued that summary judgment as to coverage, and ranking if that becomes an issue, should be denied because of disputed issues of fact. The Court has examined the evidence very carefully and where there are disputed issues of fact, they are not material to the contractual ambiguity. Thus, the Court is persuaded that there are no disputed issues of fact as to the question of intent that would preclude the Court from resolving the insured status dispute on summary judgment.

13

contract itself only allowed Gootee to charge WH Holdings for insurance premiums if Gootee was obligated under the General Conditions to purchase the insurance. Gootee gave WH Holdings a Certificate of Liability Insurance that specifically lists the ACE builder's risk policy and references in the comment section an Additional Insured Endorsement in favor of WH Holdings. (Rec. Doc. 190-26, Plaintiffs' Exhibit 17, Certificate of Liability Insurance). According to WH Holdings, all of the foregoing pre-Katrina course of conduct evidence demonstrates that Gootee procured the ACE builder's risk policy for the work at the Ritz because Gootee knew that the General Conditions required it to do so.

David Barbier was Gootee's senior estimator and project manager overseeing the pre-Katrina renovation work at the Ritz. Barbier is an important witness because he prepared the original job estimate for the Ritz and the monthly payment statements, both of which included the charge for builder's risk coverage. Barbier was also present at some of the early contract negotiation meetings between Gootee and WH Holdings. (Rec. Doc. 190-3, Plaintiffs' Exhibit 1, David Barbier deposition).

Barbier explained that it was Gootee's usual practice to purchase builder's risk insurance on its work projects because Gootee could never be assured that the owner's own policy would cover all of Gootee's exposures and risks, particularly the expensive equipment and uninstalled materials that Gootee would have on the site. (*Id.* at 52, 160, 163). Barbier did include the cost of builder's risk coverage on the initial job estimate for the Ritz but he explained that he did that estimate *without* the benefit of

14

the General Conditions because the contract was still being negotiated when he prepared the estimate. (*Id.* at 170). But because Gootee normally procured builder's risk coverage for its jobs, he included it. (*Id.*). Barbier contends that after the Ritz project was underway, he asked the architect, Mark Culotta, whether Gootee was expected to have builder's risk coverage on the project and therefore whether Gootee should maintain the coverage for the duration of the work. Barbier stated that Culotta advised him to keep it in there just to be on the safe side. (*Id.* at 170-71).

Barbier could not identify or recall if any specific person at Gootee had told him to include builder's risk coverage as part of the Ritz project costs but he explained that the ultimate decision to include or drop the coverage would have been made by one of Gootee's principals. (*Id.* at 54). But Barbier did not recall any specific discussions with the Gootee principals about builder's risk coverage for the Ritz work. (*Id.* at 53). Barbier stated that prior to Katrina he had scanned through the insurance requirements set out in the General Conditions, (*id.* at 166), but that he understood the General Conditions to require the Owner to obtain builder's risk insurance, (*id.* at 171). When asked why he included charges for builder's risk insurance in the payment statements if he believed that the General Conditions did not require Gootee to have this coverage, Barbier alluded again to his conversation with Culotta, and noted that Gootee would have wanted to protect itself in case the owner's policy did not cover something or lapsed because Gootee was just a very conservative company in that way. (*Id.* at 165).

Barbier was somewhat involved with the contract negotiations but that was more

15

Pat Gootee's role. (*Id.* at 17, 50). According to Barbier, WH Holdings' local attorney, Tom Gardner, took the lead role in putting the construction contracts together, and Gardner was the primary contact for WH Holdings on the negotiations. (*Id.* at 17). Barbier recalled that Gardner had told him that the insurance language in the contract had come directly from WH Holdings. (*Id.* at 168).

Pat Gootee is a principal of Gootee Construction and he was the most heavily involved of the principals in the contract negotiations between WH Holdings and Gootee. He was the liaison between Gootee and WH Holdings. (Rec. Doc. 190-5 at 8, Plaintiffs' Exhibit 2, Pat Gootee deposition). Pat Gootee describes his area of expertise within the company as "risk management," but he did not have any role prior to Katrina in obtaining builder's risk insurance for the company. (*Id.* at 32). And Pat Gootee could not recall having any discussions with David Barbier as to whether Gootee should procure builder's risk insurance for the renovation work at the Ritz. (*Id.*).

Gootee explained that the construction contract was negotiated between Tom Gardner, Barbier, Ken Gootee, and himself. Gootee explained that Tom Gardner also represented Gootee but that Gootee Construction used another lawyer in conjunction with the Ritz contracts. Pat Gootee did not believe that the architect, Mark Culotta, had been involved in the contract negotiations. (*Id.* at 19). According to Pat Gootee, Tom Gardner drafted the construction contracts but with suggested changes from Gootee. (*Id.* at 23-24, 34). Gootee could not recall any discussion with Tom Gardner regarding which party would be responsible for obtaining builder's risk coverage. (*Id.* at 27). Pat

16

Gootee testified that Gootee Construction's attorneys and insurance representative went through the contract piece by piece to make sure that Gootee's risks were minimized. (*Id.* at 21). Gootee Construction then made suggestions to Tom Gardner for the contract, which he then incorporated. (*Id.* at 23-24). Pat Gootee seemed to believe that his company had used the language found in subsection 11.1.5(g) before although he really couldn't answer any specific questions about that when asked, (*id.* at 51-52), including when or where that language would have been previously used, (*id.* at 55-56).

Ken Gootee is president of Gootee Construction but he was not really involved with the projects at the Ritz and had no role whatsoever in the procurement of insurance. (Rec. Doc 190-14 at 11, 19, Plaintiffs' Exhibit 10, Ken Gootee deposition). Ken Gootee had minimal involvement with negotiating the Ritz contracts because Pat Gootee was the principal involved with that work. (*Id.* at 26). Gootee explained that as a general proposition the company would procure builder's risk coverage to protect itself because Gootee Construction is just a very conservative company. (*Id.* at 25, 128). But sometimes Gootee obtained builder's risk coverage if the owner required it for the specific project. (*Id.* at 25,31). Gootee thought that he had probably read the General Conditions regarding builder's risk prior to Katrina but that he never referred to the contract to determine if Gootee was responsible to procure builder's risk coverage for the Ritz. (*Id.* at 28, 127).

Everyone identified Kathy Gootee as being the Gootee employee responsible for procuring insurance and for dealing directly with Gootee's insurance agent. In fact, the

17

specific premium amounts to include on the payment statements to WH Holdings would have been provided by Kathy Gootee because insurance was her area of responsibility. Kathy would run a computer report that contained all current Gootee projects and she used information from that report to request coverage for specific projects under Gootee's global builder's risk policy. (Rec. Doc. 190-27 at 15-16, 24, Plaintiffs' Exhibit 18, Kathy Gootee deposition). Ms. Gootee explained that the decision as to whether or not builder's risk will be obtained for a specific project is sometimes based on the contract and sometimes based on an internal decision to protect the company, even if the contract does not require the coverage. (*Id.* at 17,25). Typically, no one else at Gootee tells Kathy Gootee whether insurance is to be procured for a specific job. Ms. Gootee reviews the construction contracts herself or asks the insurance agent if the requirements are not clear. (*Id.* at 17-18).

With respect to the Ritz projects in particular, Kathy Gootee recalled looking at some of the contracts but could not be sure that she had ever reviewed the General Conditions. (*Id.* at 19-20). She surmised, however, that the decision to get insurance was probably a combination of looking at the contract and a discussion with someone, perhaps Barbier or Pat Gootee, as to whether Gootee Construction should obtain builder's risk coverage. (*Id.* at 21). Kathy Gootee clarified that she had no role in negotiating the Ritz contracts. (*Id.* at 10).

The foregoing testimonial evidence, when considered in conjunction with the objective documentary evidence, enervates several of the more salient aspects of

18

Gootee's pre-Katrina conduct that WH Holdings relies upon. The charges to WH Holdings for builder's risk premiums originated with David Barbier, who included those costs in his original project cost estimates for the work at the Ritz. But Barbier clarified that he prepared the first estimates without the benefit of a contract because everything was still being negotiated. In the absence of a contract, Barbier included costs for builder's risk coverage because it was Gootee's typical business practice to obtain builder's risk insurance on its projects as a means to protect the company from risks. All of the Gootee witnesses testified that this was Gootee's normal course of action and nothing in the record contradicts this assertion. In fact, all of the monthly reporting forms to ACE contained job site entries for customers other than WH Holdings and this supports the contention that procuring builder's risk coverage on its jobs was something that Gootee routinely did to protect itself.[12] (Rec. Docs. 190-28 to 190-39, Plaintiffs' Exhibits 19-30, Reporting Forms). It was Gootee's understanding that an owner's policy, assuming one existed, would not necessarily cover all of Gootee's exposure on a project. And in the case of the Ritz, Gootee had never obtained or even seen a copy of WH Holdings' insurance policy through Marriott International so Gootee had no reason to assume that builder's risk coverage would be unnecessary to protect itself.

     WH Holdings relies heavily on its characterization of the ACE policy as one that

---

[12] Nothing in the record addresses whether builder's risk was a contractual requirement on the other customers' jobs.

Gootee procured specifically for the work at the Ritz and in response the adoption of the General Conditions but the evidence belies this characterization. The ACE builder's risk policy was an annual policy, in this case in effect from 11/11/2004 to 11/11/2005. (Rec. Doc. 190-24, Plaintiffs' Exhibit 16, ACE Policy). The policy only had one named insured, which was Gootee Construction, and it is beyond cavil that the policy was not issued to insure any specific worksite or customer, and in fact work sites for customers other than the Ritz were covered. *See* note 4, *supra*. The ACE policy contained a Builder's Risk Completed Value Reporting Endorsement that required Gootee to report to ACE monthly the location, completed value, and type of structure to be insured. (*Id.*). Specific projects to be insured were communicated to ACE by Kathy Gootee via a monthly reporting system and the additional insurance premiums were charged to Gootee according to the additional risk incurred. When Gootee made the decision to carry builder's risk coverage at the Ritz, Kathy Gootee reported the site to ACE via the monthly reporting system in order to obtain coverage.

Thus, the fact that Gootee included the cost of builder's risk coverage in its initial job estimates, reported the Ritz location to ACE for coverage, incurred an additional premium for the coverage, and did in fact maintain builder's risk coverage for the work at the Ritz, are all unpersuasive evidence that Gootee procured the insurance in light of a contractual obligation to do so.[13]

---

[13]   Also, neither party mentioned that the General Conditions made Gootee responsible for any damage to the work until substantial completion. (Rec. Doc. 190-12, Plaintiffs' Exh 8, General Conditions § 10.1.1.1 at 41). If this is standard practice in the

WH Holdings contends that because Gootee's passed the premium costs for builder's risk coverage at the Ritz on to WH Holdings, it obviously believed that the General Conditions obligated Gootee to procure the insurance on behalf of WH Holdings. WH Holdings bases this argument on portions of the actual construction contracts (as opposed to the General Conditions) that it interprets as only allowing Gootee to charge back premiums if Gootee was obligated to procure the insurance under the General Conditions. (Rec. Doc. 209 at 10, Plaintiffs' Opposition).

The actual contract language that WH Holdings relies upon states that the "Cost of the Work" that the contractor can recover includes "that portion of insurance and bond premiums that can be ***directly attributed***" to the contract. (Rec. Doc. 190-6, Plaintiffs' Exh 3, 8/25/2004 contract § 7.6.1 (emphasis added)). It is WH Holdings' contention that "directly attributed" means the same thing as contractually required by the General Conditions. Maybe it does—or maybe it means exactly what it says, in which case it would seem reasonable to assume that a contractor who incurs an insurance premium directly attributable to its work under the contract can recover that cost. At best, the requirement of being directly attributable to the contract would be ambiguous as to whether it really means the same thing as "contractually required."

Moreover, the fact that Gootee charged WH Holdings for the premiums is also less impressive given that the specific construction contracts at the Ritz were GMP or

---

construction industry, then it offers additional support for Gootee's assertion that the company more often than not obtained builder's risk coverage on its own just to protect itself.

guaranteed maximum price contracts. This type of contract limits the contractor to a certain price for the scope of work and the contractor performs the work strictly on a cost-plus basis. The contractor bills the job based on the actual costs incurred, plus a fee, subject to a maximum price cap. Recovery of the actual costs incurred for the job is particularly important to the contractor with a GMP contract. Thus, it is not especially difficult to understand why Gootee attempted to pass the insurance premiums on to the owner, and having received no objection to doing that, was content to continue to do so.

Barbier was never asked to explain *why* he charged the premium costs for the builder's risk coverage to WH Holdings as a cost of the job if he believed that Gootee was procuring this coverage just to protect itself. This is an important question because Gootee could have protected itself by procuring builder's risk coverage and simply absorbing the premium costs internally as overhead thereby reducing its own profits on the Ritz contracts. Perhaps a charge back of this nature is customary practice with a GMP contract, or perhaps Gootee believed that the additional premiums were an extra cost directly attributable to the Ritz contract, and therefore a "Cost of the Work." Or maybe Gootee charged the costs of the premiums to WH Holdings because it believed that the General Conditions required it to procure the coverage, as WH Holdings contends. The record does not allow for a conclusion as to the *why* but simple common sense would tell one that with GMP contracts the contractor attempts to pass off as much of its costs to the owner as possible, especially when the owner is part of a corporate conglomerate like the Marriott group.

22

Throughout its briefing WH Holdings stresses that it paid the premiums with expectation that its interests would be covered. But this contention is clearly argument by counsel unsupported by anything in the record. No corporate witness testified on behalf of WH Holdings' regarding its expectations in the pre-Katrina time frame when it paid Gootee's invoices without questioning the builder's risk charge. Rob Drawbridge, who was WH Holdings' vice-president and the local ownership representative at the Ritz, was the only corporate representative to testify for WH Holdings. But Drawbridge had no direct involvement with the pre-Katrina Gootee construction contracts, or any insurance issues prior to Hurricane Katrina. (Rec. Doc. 190-13 at 16, Plaintiffs' Exhibit 9, Rob Drawbridge deposition). Drawbridge only became involved right about the time that Katrina hit. (*Id.* at 12). It is clear from Drawbridge's deposition that his expectation of coverage on the ACE policy came at some point after Katrina hit. (*Id.* at 53, 91-92, 97-98).

Mark Culotta, was the architect on the project, and he is the individual who approved the payment schedules from Gootee. WH Holdings paid the approved payment schedules, which included charges for the builder's risk premium, based on Culotta's approval. At his deposition the attorneys mostly questioned Culotta about post-Katrina events and his testimony was unenlightening as to WH Holdings' pre-Katrina coverage expectations.It is clear from Culotta's deposition, however, that he believed that Gootee

was obligated to procure builder's risk coverage.[14]

WH Holdings claims that Culotta testified that Tom Gardner made sure that Gootee understood that it had a duty to procure builder's risk insurance. (Rec. Doc. 218 at 3, Plaintiffs' Reply). The Court reviewed the specific deposition testimony that WH Holdings cited for this proposition and discovered that Culotta was merely explaining that all aspects of insurance would have been discussed at early meetings between the owners and the attorneys. (Rec. Doc. 190-15 at 43, Plaintiffs' Exhibit 11, Culotta deposition). Culotta clarified that it would have been the owners' attorneys "who made the decision to be sure that the contractor understood that there was to be a provision for various coverages for [the] job." (*Id.*). To characterize this statement as testimony that Culotta was an eye-witness to Gardner instructing Gootee that it would be responsible to procure builder's risk coverage, which is what WH Holdings does (Rec. Doc. 218 at 6, Plaintiffs' Reply), is a mischaracterization of the evidence.

On May 25, 2005, Gootee faxed to WH Holdings' attorney a Certificate of

---

[14] Plaintiffs characterize Culotta as "a third-party witness, who has no interest in this lawsuit." (Rec. Doc. 218 at 3, Plaintiffs' Reply). The Court was somewhat puzzled at this characterization because even though WH Holdings no longer has a financial interest in this lawsuit in light of the Agreement, WH Holdings was Culotta's client and it paid for the Gootee builder's risk premiums because Culotta approved the invoices. When the Court read Culotta's deposition, which it did *prior* to reading the parties' briefing, the Court perceived Culotta's demeanor with ACE's attorney to be combative at times, to say nothing of Culotta's decision to ignore the subpoena duces tecum that ACE issued in conjunction with the deposition notice. At one point during the deposition when Culotta was obviously frustrated with ACE's attorney's questions, Culotta appears to suggest that Plaintiffs' counsel was remiss in her duty to intervene on his behalf, which of course she had no duty to do because she does not represent him. (Rec. Doc. 190-15 at 68 ll. 7-8, Plaintiffs' Exhibit 11, Mark Culotta deposition).

Liability Insurance. The Certificate lists several types of coverage and the corresponding limits, and the ACE builder's risk policy is one of the policies listed. At the end of the Certificate is some manuscript text that notes that the "Additional Insured Endorsement and Waiver of Subrogation added as required by contract in favor of : W H. Holdings, LLC . . . ." (Rec. Doc. 190-26, Plaintiffs' Exhibit 17). The Certificate was issued by Gootee's insurance broker, Willis, not by ACE. There is nothing in the record to suggest that ACE had any role in issuing the Certificate or that any representative of ACE even saw the Certificate prior to this litigation.

This Certificate suffers from the same ambiguity problems that plague subsection 11.1.5(g) of the General Conditions. The Certificate was presumably provided pursuant to subsection 11.1.3 of the General Conditions,[15] which like subsection 11.1.5(g), is also located in the section of the General Conditions covering the contractor's liability insurance—hence the document's name, Certificate of *Liability* Insurance. The manuscript text in the comment section that WH Holdings relies so heavily upon does not reference a specific policy of the several listed on the face of the Certificate, and the phrase "Additional Insured" used in the Certificate is the same verbiage used in subsection 11.1.3.1 of the General Conditions.[16] No one from Willis,

---

[15]

Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work.

Rec. Doc. 190-12, Plaintiffs' Exhibit 8, General Conditions § 11.1.3.

[16]

The Owner and Architect shall be named as additional insured [sic] on all policies except Worker's Compensation policies.

and in particular the person who prepared the Certificate, was called upon to explain the content of the Certificate, and in particular the manuscript text in the comment section. The Court believes that such an explanation is essential to understanding if the Willis representative was suggesting that the additional insured endorsement applied specifically to the builder's risk policy, and if so, how Willis came to understand that such an endorsement was contractually required.

WH Holdings emphasizes that no one at Gootee really read the General Conditions. Indeed, the only Gootee employee or principal who could confirm with certainty that he reviewed the General Conditions at some point prior to Katrina, and in conjunction with the decision to procure builder's risk coverage, was David Barbier. Of course, Barbier claims to have read the General Conditions as requiring the Owner to provide builder's risk coverage for the renovations, which the Court finds plausible because the Court originally reached the same conclusion after reviewing the General Conditions. Assuming, however, that WH Holdings is correct in its assessment that no one at Gootee even read the General Conditions, it really doesn't militate in favor of the proposition that Gootee obtained the builder's risk coverage at the Ritz because it believed that it was contractually obligated to do so.

ACE points to numerous post-Katrina events and acts on the part of WH Holdings that ACE contends are inconsistent with a belief on the part of WH Holdings that it had builder's risk coverage on any policy procured by Gootee. ACE points out for

---

Rec. Doc. 190-12, Plaintiffs' Exhibit 8, General Conditions § 11.1.3.1.

instance that WH Holdings did not attempt to file a claim with ACE until nearly two years after Katrina, and that no one at the Ritz told Gootee that WH Holdings would be making a claim on Gootee's builder's risk policy until nearly two years later when Gootee was awaiting final payment on its construction contracts. ACE contends that its adjuster was told that WH Holdings' policy was covering the damage to the Ritz and therefore ACE did not adjust the claim. (Rec. Doc. 211 at 7, ACE's Opposition). ACE argues that WH Holdings' insurer did in fact pay for the damage at the Ritz and did not segregate the damages that would have been covered by a builder's risk policy from those damages that were attributable to non-renovation property damage covered by the Owner. ACE's overall assessment of what occurred in the aftermath of Katrina is that from the beginning WH Holdings sought coverage from the one and only policy that it knew afforded coverage—its own (Marriott's)—and that the notion of WH Holdings being an insured under the ACE policy was a fiction crafted by Plaintiffs as an afterthought in order to reduce their own coverage obligations.

Immediately after Katrina Rob Drawbridge contacted Marriott International because it is the primary holder of the master insurance policy. (Rec. Doc. 200-23 at 19, ACE Exhibit P, Rob Drawbridge deposition). Don Corrigan, an executive general adjuster with a firm called GAB Robins, arrived to oversee adjustment of the claim. GAB, and specifically Corrigan, adjusts all of Marriott International's property insurance claims pursuant to a contract. (Rec. Doc. 200-17 at 6, ACE Exhibit J, Don Corrigan deposition). According to Drawbridge, after Katrina Corrigan ran the

adjusting aspect of things, Drawbridge typically represented the ownership, and Doug
Saint represented Marriott on the insurance side of things. (Rec. Doc. 200-23 at 21,
ACE Exhibit P, Rob Drawbridge deposition). Drawbridge stated that it was very early
on at a meeting that he first heard about a potential builder's risk claim but he was not
sure of the date although it would have occurred early on. (*Id.* at 36, 40). Drawbridge
stated that at one of the post-Katrina meetings Corrigan asked to talk to him on the
side and told him that the insurer would be looking into everything that had taken
place with the work before the storm including looking for other sources of insurance.
(*Id.* at 37).

As the post-Katrina repairs were nearing completion and the contractors were
looking to be paid, Drawbridge explained that money was not coming from the Marriott
insurers or Marriott, which had received all of the insurance proceeds. (*Id.* at 46, 49).
On November 11, 2005, Drawbridge executed on behalf of WH Holdings a Mortgage
Hold Harmless Agreement attesting that after diligent inquiry the payment
contemplated by Marriott International's insurers would not be covered in whole or in
part by any other insurance. (Rec. Doc. 200-12, ACE Exhibit F). Drawbrige's attempt to
explain the assertions that he attested to in this document in light of his subsequent
assertion that a builder's risk claim was discussed early on at a meeting after Katrina
was unenlightening. (*Id.* at 76-80).

Don Corrigan confirmed that the issue of builder's risk coverage was discussed at
one of the first meetings after Katrina when the scope of the repair work was being

28

discussed. (Rec. Doc. 200-17 at 84, ACE Exhibit J, Don Corrigan deposition). Corrigan learned about the builder's risk policy from the ACE adjuster who had contacted him and advised that "Mr. Gootee" had said that Marriott's policy was going to cover everything. (*Id*. at 165) According to Corrigan he immediately told the ACE adjuster that this was not correct. (*Id*.). Corrigan also saw the payment schedules for the renovation work and knew then that WH Holdings had been paying for builder's risk premiums. (*Id*. at 165). Another adjuster working under Corrigan, David Buck, also contends that the insureds were told early on to place the builder's risk carrier on notice. (Rec. Doc. 200-24 at 49, ACE Exhibit Q, David Buck deposition). When it came to post-Katrina repair work, Corrigan advised WH Holdings against continuing to take out builder's risk coverage because it was an unnecessary expense in light of Marriott International's global policy. (Rec. Doc. 200-17 at 84, ACE Exhibit J, Don Corrigan deposition). As of the date of his deposition in January 2013, Corrigan had never seen a copy of the ACE policy. (*Id*. at 164).

ACE adjuster Chris Kelly stated that he was told early on that there would be no property damage claim for the Ritz. Kelly testified that he was told by the Gootees that the Owner provided insurance for the ongoing work and that he would therefore not be adjusting any property damage at that location. (Rec. Doc. 200-25 at 47-48, 54-55, ACE Exhibit R, Christopher Kelly deposition). The evidence suggests that David Barbier was the Gootee person who told Kelly that there would be no builder's risk property damage claim for the Ritz. According to Barbier, he heard Corrigan say during one of the early

29

post-Katrina meetings that the Owner's policy would be covering everything so Gootee would not have to make a claim on the builder's risk policy. ((Rec. Doc. 190-3 at 154, 158, 162, Plaintiffs' Exhibit 1, David Barbier deposition). Corrigan denies making such a statement or ever suggesting that Marriott's insurers were going to cover everything without resort to the builder's risk policy. The question of what Corrigan did or did not say regarding a builder's risk claim is clearly a disputed issue of fact but it is not a material one.

Regardless of who said what in the aftermath of Katrina about a potential builder's risk claim, the fact remains that WH Holdings did not make a claim until nearly two years after the storm. In March of 2007, Mark Culotta was gathering data for a builder's risk claim on behalf of his client WH Holdings. (Rec. Doc. 190-23, Plaintiffs' Exhibit 15, March 3, 2007 letter). WH Holdings had to have known that to date ACE's adjuster had not been involved in adjusting the claim for damages at the Ritz. And nothing in the record contradicts the Gootees' claim that they were unaware that WH Holdings wanted to make a claim on the builder's risk policy until the repair work neared completion and Gootee tried to collect its final payments under the construction contracts. It was then, according to the Gootees, that WH Holdings and its insurers told them that if Gootee wanted to get paid for the work that it had done, then it would have to get its money from the builder's risk carrier because WH Holdings was not going to pay Gootee what was owed. (Rec. Doc. 190-3 at 186, Plaintiffs' Exhibit 1, David Barbier deposition; Rec. Doc 190-14 at 124, 143, Plaintiffs' Exhibit 10, Ken

30

Gootee deposition).

ACE places much emphasis on the fact that WH Holdings waited nearly two years to submit a proof of loss to ACE. Drawbridge and Corrigan both insisted that the possibility of builder's risk coverage was discussed early on so the Court will credit their assertion, assume that Barbier simply misunderstood what Corrigan said about a potential builder's risk claim, and further assume that the decision makers for Marriott International knew about the potential claim. But then assuming that the principals at Marriott knew from the beginning what its insurers knew—that the insurers were going to resist paying for repairs to the ongoing renovation work at the Ritz—the question of why WH Holdings did not immediately pursue a claim with ACE is a perplexing one. After all, if WH Holdings believed itself to be an additional insured under the ACE policy then it didn't have to rely on Gootee to submit a claim for damage to the renovations at Ritz. WH Holdings could have simply filed its own proof of loss with ACE in the more immediate aftermath of Katrina when it was filing a property claim with Marriott's insurers.

WH Holdings never really explains why there was such a long delay in filing the proof of loss with ACE, instead focusing on a Notice of Loss that Willis sent to ACE on September 2, 2005. (Rec. Doc. 190-54, Plaintiffs' Exhibit 45, Notice of Loss). This document does nothing to help WH Holdings' position because the Notice says nothing whatsoever about property damage to the Ritz hotel. This document only

31

evinces that Gootee was putting its insurer on notice that it might be making a claim under its builder's risk policy, which Gootee did anticipate doing because of some equipment damage that ultimately turned out to be minimal. Moreover, WH Holdings once again ignores the fact that other customers' sites were also insured under Gootee's builder's risk policy. The Court is therefore at a loss to understand how the Notice supports WH Holdings' suggestion that Gootee and ACE were aware all along that WH Holdings was making a claim against the ACE policy.

But more to the point, the fact that Corrigan and his team raised the issue of a builder's risk claim early on in the adjusting process does nothing to clarify the issue of WH Holding's and Gootee's intent with respect to insurance obligations in the General Conditions. Nothing in the record suggests that anyone *with WH Holdings* informed Corrigan about a builder's risk policy on which WH Holdings was an additional insured. Rather, Corrigan learned about the builder's risk policy when talking to ACE's adjuster and also from seeing builder's risk charges on the pre-Katrina invoices from Gootee. And Drawbridge apparently learned about the policy after Katrina. The Court need not endorse ACE's assessment of the post-Katrina evidence, *i.e.*, that the notion of WH Holdings being an insured under the ACE policy was a fiction crafted by Plaintiffs as an afterthought, to reach the conclusion that the post-Katrina evidence really does nothing to assist WH Holdings in its burden of proof as to pre-Katrina insurance obligations under the General Conditions.

For all of the foregoing reasons, the Court is persuaded that the extrinsic

course of conduct evidence, pertaining to both pre- and post- Katrina events, does not resolve the contractual ambiguity created by subsections 11.4.1 and 11.1.5(g) of the General Conditions in WH Holdings' favor. In other words, the extrinsic evidence taken as a whole does not support the conclusion that the proper interpretation of subsections 11.4.1 and 11.1.5(g) is that the parties intended for Gootee to be responsible for procuring builder's risk coverage for construction that was a renovation to an existing structure.

Civil Code article 2056 dictates that an ambiguous provision in a contract be interpreted against the party who furnished the text. ACE contends that WH Holdings' attorney Tom Gardner provided the offending provision yet Pat Gootee's testimony suggests that section 11.1.5(g) in particular might have come from his company. The attorneys for neither Gootee nor WH Holdings were deposed yet these individuals would have been compelling fact witnesses with respect to what took place during the pre-Katrina contract meetings. Gardner would have been a particularly important witness because the record is clear that in many of the meetings there was no actual WH Holdings person present. After all, WH Holdings claims that Culotta personally observed Gardner instructing Gootee as to its builder's risk procurement responsibilities.

The evidence does suggest that WH Holdings through its counsel was primarily responsible for compiling and editing the General Conditions, and therefore even if Gootee submitted section 11.1.5(g) to WH Holdings for inclusion in the contract, it

33

would have been WH Holdings that likely placed the subsection in the part of the General Conditions that pertained to third-party liability coverage thereby attributing to the ambiguity. Even though WH Holdings presumably had the greater bargaining power at contract negotiations,[17] the fact remains that Gootee did submit some changes to the contract and the record does very little to clarify who did exactly what in confecting the final version of the General Conditions. The Court therefore treats the question of who created the ambiguity in the General Conditions as a disputed question of fact that precludes application of the presumption contained in Civil Code article 2056.

WH Holdings contends that it is entitled to a presumption of coverage under ACE's policy because in Louisiana policies of insurance must be interpreted liberally in favor of the insured to find coverage, and policies of insurance should be construed in accordance with the reasonable expectations of the parties. (Rec. Doc. 190-1 at 11, Plaintiffs' Memorandum).

The Court is persuaded that the foregoing presumptions regarding coverage do not assist WH Holdings' in its proof as to its status as an insured. First, those presumptions grow out of principles of equity or public policy that are particularly inapplicable in a situation where the insurer did not issue the policy to the potential insured or charge it a premium, and the policy is not one required by law for the

---

[17]   Drawbridge observed:"Marriott is very good at using their [sic] size and bulk." (Rec. Doc. 190-13 at 82, Plaintiffs' Exhibit 9, Drawbridge deposition) .

protection of innocent tort victims. WH Holdings had no dealings with ACE and did not participate in any manner in procuring the Gootee builder's risk policy. Again, ACE's obligation to WH Holdings, if any, is governed by the ACE policy, which has never been held to be ambiguous. WH Holdings cannot bootstrap itself into insured status by invoking presumptions that only an insured is entitled to rely upon.

In sum, WH Holdings has not established that the General Conditions required Gootee to procure builder's risk coverage for construction work that constituted renovations to an existing structure. The extrinsic course of conduct evidence does not resolve the ambiguous General Conditions in WH Holdings' favor. Mindful of the fact that the General Conditions must be interpreted so that subsection 11.1.5(g) has meaning, the Court is persuaded that subsection 11.1.5(g) shifts the builder's risk obligation to the Owner when renovation work is involved. For the reasons given by the Court in its original opinion, such a shift in responsibilities makes sense where renovation work is involved. (Rec. Doc. 149). WH Holdings has offered no other plausible interpretation for what the subsection means. WH Holdings did pay a significant amount of money to Gootee for builder's risk premiums but the obligation that WH Holdings is attempting to enforce is against ACE, not Gootee. ACE was not a party to the General Conditions and it played no part in the confection of that ambiguous document. ACE did not charge WH Holdings premiums only to later repudiate coverage. WH Holdings and ACE were not in privity. The sole mechanism for Plaintiffs to recover from ACE under Gootee's builder's risk policy is via the Broad

Named endorsement which is ACE's promise to recognize as an insured any party that Gootee was responsible for insuring. But having failed to establish that the proper interpretation of the General Conditions is that WH Holdings and Gootee intended for Gootee to be responsible for insuring WH Holdings' interest in the Ritz renovations, ACE is not obligated to recognize WH Holdings as a named insured on its policy.

The issue of whether Plaintiffs' policy or ACE's policy was primary is moot.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 190)** filed by plaintiffs WH Holdings, LLC, AXIS US Insurance Co., XL(Bermuda) Ltd., Lloyds of London, and Swiss Re International SE is **DENIED**;

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 200)** filed by defendant ACE American Insurance Co. is **GRANTED**.

May 22, 2013

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE